**H. Peter KRIENDLER and Kenneth L. Seposs, individually and on behalf of a class of persons similarly situated, Plaintiffs,**

**v.**

**CHEMICAL WASTE MANAGEMENT, INC., WMX Technologies, Inc., and Philip B. Rooney, Defendants.**

No. 93–C–5694.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 31, 1995.

---

Edwin J. Mills, Stull, Stull & Brody, New York City, David Pastor, Gilman and Pastor, Boston, MA, for H. Peter Kriendler.

Kenneth Hamilton Hanson, Law Office of Kenneth H. Hanson, Chicago, IL, Karen Morris, Morris & Morris, Wilmington, DE, for Kenneth L. Seposs.

Nicholas Joseph Etten, John William Rotunno, Peter G. Rush, Bell, Boyd & Lloyd, Chicago, IL, for Chemical Waste Management, Inc., WMX Technologies, Inc., and Philip B. Rooney.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This lawsuit involves a putative class action claiming securities fraud based on purported violations of Section 10(b) and Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Securities and Exchange Commission Rule 10(b)(5). Plaintiffs assert a fraud-on-the-market theory. No answer has been filed and no counterclaims are pending. Defendants have filed a Motion to Dismiss all counts of the Consolidated Class Action Complaint ("Consolidated Complaint"), pursuant to Federal Rule 12(b)(6). Plaintiffs seek certification of the class. For the reasons given below, the Court grants the Motion to Dismiss (doc. # 40–1). The Plaintiffs' Motion for Class Certification is also granted (doc. # 46–1).

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Ass'n, Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). All well-pleaded facts are taken as true, all inferences are drawn in favor of the plaintiff and all ambiguities are resolved in favor of the plaintiff. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992). In this case, Rule 9 of the Federal Rules of Civil Procedure requires the underlying facts of the lawsuit to be set out with particularity. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The federal system of notice pleading does not favor dismissal for failure to state a claim. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir.1988). In short, the only question is whether relief is possible under any set of facts that could be established consistent with the allegations. *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992), *citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## BACKGROUND

Plaintiffs' well-pleaded allegations, which the Court takes as true for purposes of this Motion, are as follows. Defendant, Chemical Waste Management Company, Inc. ("CHW"), was formed as a wholly owned subsidiary by defendant WMX in 1978. In late 1986, all of WMX's domestic, hazardous waste management services were consolidated into CHW. On October 16, 1986, 37.8 million new CHW common shares were sold to the public in a registered initial public offering. As a result, CHW is a 77%–owned subsidiary of defendant WMX. Defendant Philip B. Rooney ("Rooney") has served as a director of CHW since 1986 and was, as of December 31, 1992, Chairman of the Executive Committee of the Board of Directors of the Company. Rooney has also served as President and Chief Operating Officer of WMX since November of 1984 and, since November of 1990, has served as Chairman of the Board and Chief Executive Officer of certain other WMX subsidiaries.

Plaintiffs purchased common stock in CHW between February 4, 1993 and September 3, 1993, inclusive (the "Class Period"). Plaintiff, H. Peter Kriendler ("Kriendler"), purchased 2,000 shares of CHW common stock on March 8, 1993, at a price of $18⅞ per share. Kenneth L. Seposs ("Seposs") purchased .3213 shares at $15.00 per share. Plaintiff, James C. Tennison ("Tennison"), purchased 300 shares of CHW common stock on March 16, 1993, at a price of $17⅞ per share and an additional 300 shares on May 7, 1993, at a price of $12⅝ per share. Plaintiff, Howard Zuckerman ("Zuckerman"), purchased 2.74 shares of CHW common stock on April 1, 1993, at a price of $15.50 per share under a dividend reinvestment plan.

CHW's treatment and resource recovery operations involve processing chemical waste through the use of thermal and other treatment methods at one of the Company's facilities. Thermal treatment refers primarily to processes that use incineration as the principal mechanism for waste destruction. At the close of CHW's fiscal year ended December 31, 1992, the Company owned or leased incinerator facilities on the Southeast side of Chicago, Illinois; at Sauget, Illinois; and at Port Arthur, Texas. Prior to December 31, 1992, CHW had also applied to applicable regulatory authorities for permission to operate incinerators in California and Mexico.

One of the Company's thermal treatment facilities which used incineration is a rotary kiln incinerator located at 11700 Stony Island Avenue in South Chicago, Illinois (the "Stony Island Facility"). CHW received a permit for the destruction of chemical wastes, including polychlorinated biphyenyls ("PCBs") at the Stony Island Facility in late 1983. By December 31, 1992, CHW had experienced enormous continuing operating and regulatory problems at the Stony Island Facility, including the following.

In 1988, the State of Illinois began enforcement actions against CHW relating to its operation at the Stony Island Facility. In particular, on or about February 13, 1991, CHW experienced an explosion in the kiln at

the Stony Island Facility. The explosion resulted from CHW mistakenly incinerating a load of flammable chemicals, and the Stony Island Facility has not operated since the explosion.

In September of 1992, a Cook County grand jury indicted a CHW supervisor at the Stony Island Facility, Dale Gawlak ("Gawlak"), for allegedly altering waste labels to evade safety rules. In February of 1992, Gawlak publicly stated that CHW officials had told him to change the dates on the labels to avoid a requirement in a court order which limited the amount of hazardous waste that could be held at the Facility for more than ninety days. Gawlak was convicted on September 13, 1993, following a bench trial. Ultimately, CHW agreed to pay fines and penalties totalling an amount well in excess of $6,000,000, as a result of its operation of the Stony Island Facility, which is a state record.

Following the explosion in 1991, CHW agreed to keep the Stony Island Facility shut down until it received a Part B operating permit from the State of Illinois. The Company had previously applied to the Illinois Environmental Protection Agency ("IEPA") for a long-term permit for the Facility, but that application was denied in 1989 based upon ninety-six (96) deficiencies noted by the IEPA in the Company's application and proposed procedures for operating the Stony Island Facility. As of December 31, 1992, the Company was representing that it was continuing to seek a long-term permit. The Stony Island Facility has not been in active operation since the explosion in 1991, and as of February 4, 1993, there was no assurance that the Facility would ever again be in operation.

On February 4, 1993, CHW publicly announced and stated the results of its operations for fiscal year ended December 31, 1992, in a news release which was carried over major business and securities news services. In their year-end financial statements,[1] released on February 4, 1993, CHW reported the value of the Stony Island Facility at historical book value and made hopeful statements that they were holding discussions with regulatory authorities concerning the reopening of the Stony Island Facility. At the close of trading on February 4, 1993, CHW stock traded at $21 per share. Property, plant and equipment included CHW's incinerator facilities, which were reported in the financial statements at historical cost.

Several trends began developing in the hazardous waste industry in the 1990's, including a permanent shrinking in the demand for off-site hazardous waste incinerators, increasing efforts at conservation, pretreatment and recycling of hazardous waste, overcapacity for both hazardous waste landfills and incinerators, and the Environmental Protection Agency's strong preference for on-site treatment of hazardous wastes. The shrinking demand for hazardous waste incinerators existed prior to December 31, 1992. For example, CHW was aware that the amount of hazardous waste generated by California had fallen an additional 10% in 1991, and an additional 10% in 1992. CHW was also aware that one of its customers in the chemical and petroleum industries, Amoco Chemical Company of Illinois, had reduced the volume of hazardous waste shipped off-site by it by about 97% from 1983 through 1992. Additionally, during 1992, United States companies engaged in a fundamental change in corporate policy concerning waste management, consciously limiting off-site dis-

---

1. The public statement released by CHW on February 4, 1993, revealed that net income for its 1992 year was $126,735,000, an improvement over the $100,806,000 earned for fiscal 1991. At that time CHW also reported an improvement in total assets from $2,025,512,000 at year end 1991 to $2,442,379,000 at year-end 1992, of which there had been an increase in property, plant and equipment from $1,010,515,000 at year-end 1991 to $1,172,270,000 at year-end 1992. CHW's reported results for 1992 included a special charge of $51,000,000 which had been recorded in the second quarter of 1992 relating to the Stony Island Facility and another incinerator in Tijuana, Mexico. The $51,000,000 charge taken in the second quarter of 1992 related to anticipated costs of ongoing maintenance of the Stony Island Facility during its shutdown, severance pay for laid-off personnel, unaccrued penalties imposed and other costs. The $51,000,000 charge relating to the Stony Island Facility in 1992 did not include any amount which represented a write-down or reduction in the carrying value of the Stony Island Facility to its then-current impaired value.

posal of hazardous waste and, indeed, sharply reducing their output of hazardous waste, through such methods as pretreatment, enhanced recycling and conservation. This change in policy was primarily due to: (i) increasing costs for landfill and incineration (with landfill costs having risen from $15–25 per ton in the 1970's to $150–250 per ton currently), (ii) concern over liability exposure on the part of the waste generators (particularly with respect to land disposal, where there is no termination of liability), (iii) negative publicity, caused by the EPA's reporting requirements, (iv) regulatory restrictions on land disposal, and (v) development of products that generate less waste, such as biopesticides, alternatives to cholorfluorocarbons and substitutes for chlorinated solvents. Environmental clean-up projects also were reduced during 1992, in part due to uncertainty over the renewal of Federal Superfund legislation, higher costs of off-site removal, tougher rules on off-site disposal and other regulations which encourage on-site remediation, and the lower volumes at environmental clean-up projects. Prior to December 31, 1992 (and before the change in Federal administrations), the Environmental Protection Agency had expressed a strong preference for on-site treatment of hazardous wastes, including the proposal of new hazardous waste regulations which were projected to shift from 20% to 90% of all hazardous wastes away from landfills and incinerators, thereby reducing the amount of hazardous waste material to be trucked to the off-site facilities owned, operated or leased by CHW.

During 1992 and in March of 1993, CHW and WMX (on CHW's behalf) also made several predictions regarding the long-term financial prospects for CHW. In its 1992 Annual Report to Shareholders, released during the Class Period, CHW represented that the July 1992 formation of the Company's Thermal Operations Group "allowed the Company to provide customers with needed incineration capacity." In fact, there already existed an excess of capacity which resulted in a permanent impairment in the value of the Company's incinerators. CHW optimistically projected in its 1992 Annual Report that "continued suspension of operations at the Chicago incinerator while the [long-term]

permit is being pursued is not expected to materially impact future results of operation."

In its 1992 Annual Report, WMX reported that CHW "aggressively undertook programs" to "streamline its organization across the board" in an effort "to focus further on controlling its costs while enhancing service to customers" and predicted that CHW waste services "should expect to see its revenues grow to more than $2 billion in 1993." Additionally, on or about March 15, 1993, CHW advised the market that it expected to report earnings for the first quarter of 1993 comparable to its earnings for the first quarter of 1992. Ultimately, CHW was able to obtain comparable earnings by executing the sale of Wheelabrator Technologies, Inc., a company in which CHW had a stake and in which WMX held majority ownership. The execution of this sale accounted for 40% of its first quarter 1993 earnings.

The market responded to these reports and predictions in the following ways. On February 4, 1993, Prudential Securities issued a public report based upon the just-released earnings, recommending that investors buy CHW common stock and commenting on CHW's apparent "continuing strong based business" and a supposedly strong recent pick-up in CHW's bidding activity on special projects. On February 8, 1993, the Chicago Corporation, another securities firm, commenting on CHW's just released year-end 1992 results, opined that "the Company is positioned for strong 1993 results," and "for the first time in nearly two years, the Company now feels it is seeing a pick-up in volume attributable to an economic recovery," and "management appears confident that the special services group will see strong revenue growth in 1993." Based upon the Company's reported results for year-end 1992, the Chicago Corporation estimated CHW's 1993 earnings at $0.95 per share and recommended that investors buy CHW common stock "because of the company's outstanding market position and improving earnings outlook."

In a February 9, 1993, report, Merrill Lynch, based upon its belief that CHW's

1993 earnings momentum could exceed general expectations, rated CHW above average /2/ and buy /1/ for the intermediate and long terms, respectively, noting:

> [W]e expect revenues to sequentially rise as 1993 progresses. Moreover, the recently reported fourth quarter ... indicated significant underlying operating leverage potential. Importantly, earnings visibility appears to be higher now than at any time over the past ten quarters. Finally, the large earnings gains we expect from Chem–Waste beginning in the first quarter and extending through 1992 should be a significant building block for a re-acceleration of Waste Management's earnings growth as well.

In fact, on March 18, 1993, Prudential was recommending that investors purchase CHW common stock based, in part, on the earnings and other financial data reported for year-end 1992 and based on the Company's estimate of first quarter earnings.

After CHW released its earnings for the first quarter of 1993, it made several statements regarding the reasons for its "flat" or "reduced" earnings. CHW reported that the reasons for a 6% decline in business revenues for the first quarter of 1993, as compared with the first quarter of 1992, were primarily due to temporary conditions, such as bad weather, a weak domestic economy, and the change in the Federal Administration.

On July 19, 1993, CHW, for the first time, hinted that market conditions and other factors might require a downward assessment in the carrying value of its incineration assets. On that day, CHW issued a press release which stated that "the Company ... will be reviewing whether certain of its assets relating to hazardous waste incineration services are appropriately valued in light of the market conditions referred to above." No write-down was taken at that time. The July 19, 1993, press release suggested that "the possibility exists that the company will record a charge which could be material to its results of operations."

On or about September 3, 1993, the Company announced that it had abandoned plans, begun in 1987, to build an incinerator in Kettleman Hills, California. CHW also ac-knowledged that existing incinerator capacity was adequate to meet the disposal needs of the western United States. Following this disclosure, at the close of trading on September 3, 1993, CHW common stock fell to $9.25 per share—a decline of over 50% from the trading price at the commencement of the Class Period only eight months earlier. The September 6, 1993, edition of *Crain's Chicago Business* thereupon reported:

> The company's restructuring options are fairly straightforward, based on public financial records, the company's own statements as to the bleak condition of the hazardous waste disposal market and analysts' views on what the company must do to improve profitability.

> The basic elements of Chemical Waste restructuring likely will be to write-down assets—particularly incineration facilities—to more closely reflect their current value, and to sharply cut back overhead.

The September 6, 1993, edition of *Crain's Chicago Business* also quoted Prudential Securities analyst Vishnu Swarup as predicting that CHW will take a write-down of fixed assets in the range of $100 million to $200 million. The article also states that other analysts believe the overall write-down may be as high as $400 million.

On September 30, 1993, CHW finally announced that it would take a $363 million after-tax charge (i.e., a "special asset reevaluation and restructuring charge") against third quarter earnings. Seventy percent (70%) of this charge related to CHW's thermal treatment businesses covering incinerators and fuel burning operations, and included a write-down of the value of the Stony Island Facility to zero. Defendant Rooney reviewed, commented upon and/or participated in the preparation of drafts of the public reports, documents and statements by the Company referred to herein or had the opportunity to do so. Each of the public reports, documents and statements referred to above resulted from the collective efforts of Company management and others both within and outside of the Company (including Rooney) and constituted group-published information.

## DISCUSSION

■ This case involves allegations of securities fraud, based on Section 10(b) of the Securities and Exchange Act ("SEA") and Rule 10b–5 promulgated thereunder. In order to state a claim under Rule 10b–5 and § 10b of the SEA, a plaintiff must demonstrate that: (1) the defendant made an untrue statement of a material fact or omitted a fact that rendered a statement made by the defendant misleading; (2) in connection with a securities transaction; (3) with the intent to mislead; and (4) the misrepresentation or omission caused plaintiff's loss. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir. 1989). An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988).[2]

■ Because the SEC has adopted the policy of encouraging companies to make predictions about future performance, predictions are not actionable so long as they fall within the "safe harbor" for forward looking statements promulgated under the 1934 Exchange Act. Typically referred to as the SEC's "safe harbor," Rule 3b–6 provides that a company's predictions of future performance shall not be deemed to be fraudulent statements unless they are made or reaffirmed without a reasonable basis in fact or are not made in good faith. 17 C.F.R. § 240.3b–6. A poor prediction does not automatically subject a company to suit under the securities laws. *Arazie v. Mullane*, 2 F.3d 1456, 1465–66 (7th Cir.1993). *See also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513–14 (7th Cir.1989) (addressing Rule 175,

17 C.F.R. § 230.175, the analog to Rule 3b–6).

■ Regardless of whether the plaintiff is challenging a misstatement, an omission, or a prediction, the plaintiff also must establish that the defendant acted with *scienter*.[3] *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155, and *cert. denied, Meers v. Sundstrand Corp.*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). In this Circuit, that means that the plaintiff must establish that the defendant acted at least recklessly. *Renovitch v. Kaufman*, 905 F.2d 1040, 1046 (7th Cir.1990) (citations omitted).

■ In the case of an alleged omission, the plaintiff must show that the defendant omitted facts with the intent to deceive, defraud, or manipulate. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Schlifke*, 866 F.2d at 946. Allegations of recklessness are sufficient if the alleged omission is a:

> highly unreasonable omission involving not merely simply, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.

*Sundstrand*, 553 F.2d at 1045. As the Seventh Circuit emphasizes, however, the question is not whether the defendant knew of the undisclosed facts, but whether the defendant knew or should have known of the danger of misleading buyers by failing to disclose those facts. *Schlifke*, 866 F.2d at 946 (citing *Sundstrand*, 553 F.2d at 1045).

■ A plaintiff alleging fraud must satisfy heightened pleading standards.[4] Fed.

---

2. The question of the materiality of an omission is most appropriately left for the trier of fact, for it depends on an assessment of the inferences that might reasonably be drawn from the facts and the significance that might be ascribed to these facts and inferences by a reasonable investor. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976).

3. In the Seventh Circuit, the same degree of *scienter* is required for both primary liability and liability based on a cause of action for aiding and abetting. *Schlifke*, 866 F.2d 935, 946–47 (7th Cir.1989).

4. Although Rule 9 is a derivative of Rule 8's liberal notice pleading requirement, "slightly more" is needed for Rule 9(b) than for Rule 8. *Tomera v. Galt*, 511 F.2d 504 (7th Cir.1975).

R.Civ.P. 9(b). Rule 9(b) requires that the "circumstances constituting fraud or mistake shall be stated with particularity." The reference to "circumstances" in the rule requires "the plaintiff to state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 924 (7th Cir.1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)); *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992); 5 Wright & Miller, Federal Practice and Procedure § 1281, at 364 (1969). In other words, the plaintiff must plead the circumstances constituting fraud in detail, the "who, what, when, where, and how ... of the alleged fraud." *Arazie,* 2 F.3d at 1465 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)). This stringent pleading burden is intensified when, as in this case, all of the substantive allegations have been made solely on "information and belief." In these circumstances, the Plaintiffs "must set forth the facts on which that information and belief rests." *In re Abbott Laboratories Securities Litigation,* 813 F.Supp. 1315, 1318 (N.D.Ill.1992); *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683–84 (7th Cir.1992).

Because Rule 9(b) serves the purpose of providing notice of the claim to the adverse party, Rule 9(b) precludes a plaintiff from "simply point[ing] to a bad result and alleg[ing] fraud." *In re Westinghouse Securities Litigation,* 832 F.Supp. 948, 965 (W.D.Pa.1993). Instead, a plaintiff must provide "enough detail about the underlying facts which illustrate that a firm's public statements were fraudulent to allow a court to evaluate the claim in a meaningful way." *Arazie,* 2 F.3d at 1465. "Courts generally are satisfied that allegations of fraud are adequate if the pleadings allege the time,

place and particular contents of the false representations as well as the identity of the parties involved and the injury incurred thereby." *In re Olympia Brewing Co. Securities Litigation,* 674 F.Supp. 597 (N.D.Ill. 1987).

Thus, the Plaintiffs in this case may not simply proffer the fact that CHW's financial results in July of 1993 differed from the earlier-offered projections. *Arazie,* 2 F.3d at 1465. "Because only a fraction of financial deterioration reflects fraud, ... [i]nvestors must point to some facts suggesting that the difference is attributable to fraud." *Id.* The degree of specificity required in a case like the one before us—a case challenging defendants' performance projections and subsequent failure to make public adverse information affecting those projections—is evident from the Seventh Circuit's analysis in *Arazie* and *DiLeo.*

In *DiLeo,* the Seventh Circuit considered the sufficiency of the allegation that defendant Ernst & Young "'became aware that a substantial amount of receivables reported in [Continental Illinois Bank's] financial statements were likely to be uncollectible.'" *DiLeo,* 901 F.2d at 626 (quoting from the complaint).[5] The complaint contained allegations concerning the amount by which the loss reserve, net credit loss, and non-performing loan accounts were understated. *Id.* at 626–627. The Seventh Circuit concluded that the allegations did not have the required specificity, despite the fact that the complaint specified the amounts of the alleged understatements.

The Seventh Circuit's comments illustrate the high degree of specificity required to escape dismissal. The court noted that:

The complaint does not ... give examples of problem loans that E & W should have caught, or explain how it did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate.

5. The *DiLeo* suit grew out of Continental Illinois Bank's financial troubles in the early 1980's. The plaintiffs' basic complaint was that Continental did not increase its reserves for non-performing loans fast enough. *Id.* at 626. The primary allegation against Ernst & Young was

that Ernst & Young realized that the receivables were uncollectible before plaintiffs purchased their stock in Continental and violated the securities laws by certifying fraudulent financial statements. *Id.*

. . . .

... [e]ven a large column of big numbers need not add up to fraud. For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the write-off, based on estimates of probability that a particular debtor will pay, we do not have fraud.... Recklessness or fraud in the making of loans is not the same as fraud in discovering and revealing that the portfolio has turned sour.

*Id.* at 626–27. Thus, an allegation that the defendant had information but failed to disclose it is insufficient. The plaintiff must provide the additional information necessary for a court to evaluate whether the defendant's failure to act is fraudulent rather than merely negligent.

*Arazie* places an additional gloss on *DiLeo* that is relevant to the instant case because it applies *DiLeo* to a situation involving allegedly fraudulent predictions.[6] The plaintiffs in *Arazie* alleged, in part, that Bally's public statements lacked a reasonable basis because Bally would be unable to meet its obligations with its existing cash flow and the statements failed to warn investors that Bally faced a liquidity crisis. *Id.* at 1461. In support of this allegation, plaintiffs included the following allegations in the complaint: (1) internal memoranda predicted cash shortfalls and increased competition; (2) Bally obtained a loan from a subsidiary and hired an investment banker to do a stock-for-debt swap; and (3) Bally's fitness center subsidiary was generating lower than expected cash. *Id.* at 1467.

The court concluded that these allegations and others contained in the complaint did not meet the requirement that plaintiffs plead particular facts showing that the challenged statements lacked a reasonable basis. With regard to the plaintiffs' reference to internal projections, the court noted that the complaint "does not indicate who prepared the projected figures, when they were prepared, how firm the numbers were, or which Bally officer reviewed them." *Id.* With regard to the alleged conflict between an internal memorandum addressing Bally's competitive position and Bally's public statements, the court found that:

[n]o date, author, or addressee is indicated. Again, the 'who, what, where and when' are missing. Bally was aware of, and published in its quarterly reports, the effect of its restructuring ... The scanty descriptions of internal memoranda do not undermine the foundation of Bally's public predictions of its performance, particularly given the extensive detail of its operations included in Bally's annual and quarterly reports.

*Id.* The Seventh Circuit concluded that "the stockholders seem to 'infer fraud' from the temporal proximity of the favorable reports with the inauspicious revelations of October 1990.... [T]emporal proximity do[es] not create an inference that earlier statements were fraudulent." *Id.* at 1467–68. With these standards in mind, we now turn to the allegations in the complaint.

## I. The Motion to Dismiss

 Plaintiffs have filed a Consolidated Complaint, seeking class certification for their claims.[7] In the Complaint, Plaintiffs allege a "fraud-on-the-market" theory[8] in

---

**6.** *Arazie* involves a suit by a class of plaintiffs who purchased Bally Manufacturing Company stock during a certain period in 1990. *Arazie,* 2 F.3d at 1458. The plaintiffs alleged that Bally and certain of its officers "painted an unjustifiably rosy picture of Bally's financial health ...," and that the defendants "fraudulent misstatements artificially increased the prices the stockholders paid for the Bally stock." *Id.* One group of challenged statements concerned Bally's alleged failure to disclose a " 'looming liquidity crisis.' " *Id.* at 1459 (quoting from the complaint). Another group of statements concerned

Bally's prospects for success in its operations. *Id.*

**7.** The Motion for Class Certification is addressed *infra.*

**8.** The fraud on the market theory has three components: (1) plaintiffs need not prove individual reliance on the omission or misstatement. Reliance upon the integrity of the market is presumed. *Basic v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988). Second, according to the efficient market hy-

Count I, namely, that CHW was the primary violator and that CHW's stock price was artificially inflated by three things: (1) CHW's failure to write-down certain assets by December 31, 1992 (i.e., the Stony Island Facility incinerator assets); (2) the dissemination of five allegedly misleading statements; and (3) CHW's purported failure to inform the public of certain adverse trends that were unfolding in the hazardous waste disposal market. The complaint also seeks to impose liability on defendants Rooney and WMX as primary violators and aiders and abettors [9] (Count I) and as control persons [10] of CHW (Count II). Because Plaintiffs have "lumped" all the defendants together, alleging the same claims against each, the analysis which follows is applicable to each defendant.

Defendants have not answered Plaintiffs' allegations, but instead have chosen to file a Motion to Dismiss. In the Motion, Defendants make three arguments: (1) CHW's alleged failure to write-down certain assets by December 31, 1992, is not actionable fraud, but a legitimate exercise of business judgment; (2) CHW's alleged dissemination of five allegedly misleading statements is not actionable fraud because these statements lack the essential ingredient of a falsehood, fall within the SEC safe harbor, and do not mislead; and (3) CHW's purported failure to inform the public of certain adverse trends that were unfolding in the hazardous waste disposal market is not actionable as a matter of law because SEC Regulation SK–303, which requires companies to report certain events, uncertainties and trends, does not provide a private right of action. *In re Veri-Fone Securities Litigation,* 11 F.3d 865 (9th Cir.1993) (it is "well established that a violation of an exchange rule will not support a private claim."). In addition, defendants claim that plaintiffs' allegations of fraud fail to satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b).

## A. The Write–Down

### 1. *Rule 9(b)*

The issue under Fed.R.Civ.P. 9(b) is whether Plaintiffs have alleged with sufficient particularity that Defendants, having decided to take a write-down of the Stony Island Facility, intentionally and knowingly withheld this information from the marketplace during the Class Period. After reviewing the Seventh Circuit decisions on this issue,[11] the Court finds that Plaintiffs' allegations *do not satisfy the particularity requirements for* scienter *under Rule 9(b), and we therefore must dismiss the case.*

The Complaint alleges that "[a]t year-end 1992, defendant [CHW] should have reported material write-downs in the carrying value of CHW's property, plant and equipment, prin-

pothesis, the market is an open and developed one which immediately "impounds all available information, even knowledge that is difficult to articulate" and obtain. *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1129 (7th Cir.1993). Upon publication of the information, the market immediately reacts, adjusts and incorporates the new information into the stock price. *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992). Third, plaintiffs are charged with knowledge of *all* available information; they cannot "myopically focus ... on a lie and ignor[e] the truthful information already available to the market which is reflected in the price of the security." *Id.* Finally, in order to state a claim under Rule 10b–5, the plaintiff must claim "loss causation" by alleging facts suggesting that, "but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which [s]/he complains." *Id.* (citing *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685 (7th Cir.)), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990).

**9.** Liability based on a theory of aiding and abetting requires proof of several elements in addition to those required for primary liability, namely: (1) the existence of a primary violator; (2) knowledge by the aider and abettor of the primary violation; and (3) substantial assistance by the aider and abettor in the perpetration of the primary violation. *Schlifke,* 866 F.2d at 947.

**10.** "Controlling Person" liability under § 20(a) of the SEA, 15 U.S.C. § 78t(a) is still not a clearly defined cause of action in the Seventh Circuit. But, it is clear that liability under *this theory* requires factual allegations showing that the named defendant had "the practical ability to *direct* the actions of the people" who did the dastardly deed. *Schlifke,* 866 F.2d at 949.

**11.** In addition to the major decisions analyzed *supra,* the Court has also reviewed the following cases: *Vicom v. Harbridge Merchant Services,* 20 F.3d 771 (7th Cir.1994); *Robin v. Arthur Young & Co.,* 915 F.2d 1120 (7th Cir.1990), and *Tomera v. Galt,* 511 F.2d 504 (7th Cir.1975).

cipally its incinerators, in order to comply with [Generally Accepted Accounting Principles] GAAP...." (Cmplt. ¶ 31). Plaintiffs allege that in "failing to *timely* record write-downs" and in "failing to properly disclose and account for a permanent impairment in the value of the value of the Company's plant and equipment assets, particularly its incinerators," the market price of CHW was artificially inflated. (Cmplt. ¶ 55) (emphasis added). The Complaint acknowledges that CHW wrote-down the Stony Island incinerator nine-months later. (Cmplt. ¶ 54). However, the Complaint also asserts that CHW should have taken an accounting write-down as of December 31, 1992, because it knew the impact adverse trends in the hazardous waste industry would have on CHW's 1993 revenues (Cmplt. ¶ 38).

### (a) Scienter

■ The allegations in the Consolidated Complaint do not provide a basis for the Court to infer that defendant Rooney (on behalf of CHW) either knowingly and intentionally withheld information regarding the value of the Stony Island Facility from the marketplace. Although states of mind may be pleaded generally under Fed.R.Civ.P. 9(b) (thereby relaxing the pleading burden under 10b–5), the Rule requires Plaintiffs to plead "with particularity" any "circumstances constituting fraud." Allegations that a defendant knowingly and intentionally withheld information from the marketplace must still be supported by facts which provide a basis for believing that the Plaintiffs could prove *scienter* at trial. *See DiLeo*, 901 F.2d at 629. The allegations in the Consolidated Complaint do not provide a factual basis for this inference but instead assert, in a conclusory fashion, that CHW knew or had reason to know that the economic value of the Stony Island Facility was no longer equal to its historical book value.

■ The inference Plaintiffs apparently wish this Court to draw is that CHW knew that it needed to take a write-down of the Stony Island Facility at the end of 1992, but delayed the action until July of 1993, to "inflate" CHW's stock price. Plaintiffs' theory is based primarily on three allegations:

(1) By December 31, 1992, CHW knew there were no "assurances" that Illinois regulatory authorities were not going to issue a long-term operating permit, allowing CHW to re-open the Stony Island Facility (¶ 13); (2) During the 1990's several "trends" had been developing in the hazardous waste industry which CHW knew would reduce the amount of hazardous waste material to be trucked to the off-site facilities owned, operated or leased by CHW (¶ 38); and (3) CHW attributed its weak first quarter 1993 earnings to temporary conditions (i.e., the weather, the economy, and a change in the Federal Administration) rather than the impact of industry trends (mentioned above) on CHW (¶ 40(e)).

Even accepting these allegations as true for purposes of this Motion does not resolve the Rule 9(b) problems at the heart of Plaintiffs' Complaint: (1) there are no factual allegations which indicate *how* Rooney, on behalf of CHW, knew that the denial of a long-term permit for the Stony Island Facility would affect the valuation of the Stony Island Facility before the decision to take a write-down actually occurred; (2) there are no allegations indicating *when* Rooney knew that CHW intended to write-down the Facility before the announcement was made; and (3) there are no allegations indicating *what* information Rooney purposefully withheld/concealed from the market (i.e., all the allegations identify information which was available to the public and the market during the Class Period). Furthermore, there are no allegations linking Rooney's general knowledge of industry trends with the ultimately adverse financial impact of these trends on CHW. These are the kind of allegations necessary to sustain Plaintiffs' Complaint under Rule 9(b) and which are wholly lacking in Plaintiffs' Complaint.

### (b) Timing: A Business Judgment

■ Plaintiffs allege that "[a]t year-end 1992, defendants should have reported material write-downs in the carrying value of CHW's property, plant and equipment, principally its incinerators, in order to comply with GAAP." (¶ 31). Defendants claim that Plaintiffs' allegations "suggest" that "CHW

actually reached an internal conclusion that GAAP dictated a material write-down of the Company's incineration facilities from historical cost to some unspecified market value, that despite this conclusion CHW failed to record that write-down in its financial statements, and that CHW—with the intent to deceive—concealed these facts from the investing public." (Def. Mem. at 6). Defendants then contend that "the write-down claim boils down to a challenge to CHW's accounting *judgment* (based on CHW's interpretation of public facts), and a disagreement with the *timing* of CHW's write-down." (*Id.*) In response, Plaintiffs quote at length from various accounting standards in an attempt to establish that GAAP required CHW to write-down the value of the Stony Island Facility once its impairment was known.

Although both parties make much of the accounting judgment issue, the bottom line in this case is that Plaintiffs have failed to allege facts which would provide a basis for this Court to infer that CHW actually concealed a decision to write-down its assets before July 1993. In addition, even if CHW contemplated a write-down before its public announcements in July and September of 1993, "[f]irms are not required to make public in-house estimates of their future performance," and "internal projections still in the process of consideration and revision cannot serve as the basis for [10b–5] liability." *Arazie*, 2 F.3d at 1468 (citing *Wielgos*, 892 F.2d at 514). Thus, any discussions regarding a write-down which CHW might have had prior to its announcement (but chose not to disclose to the public) are not actionable as fraud, unless those discussions moved from the consideration and projection phase into an actual write-down phase. Without factual allegations to support this conclusion, the Court must dismiss the Complaint.

Plaintiffs' theory related to the timing of the write-down is similarly flawed. The *timing* of the write-down is evidence, Plaintiffs contend, which would support a reasonable inference, drawn from the ultimate disclosure and eventual taking of the write-down, that CHW knew that a write-down was imminent before the July 1993 announcement. (Pls. Opp. Mem. at 16, 19 n. 8). Plaintiffs then

claim that "the law is clear that a belated disclosure of a permanent impairment in value does *not* cure a previous nondisclosure." *See In re Frank B. Hall & Co., Inc.*, 693 F.Supp. 1460, 1465 (S.D.N.Y.1988) (refusing to dismiss securities fraud claim alleging that company's insurance subsidiary was carried on company's books at excessive value); *Jaroslawicz v. Engelhard Corp.*, 704 F.Supp. 1296, 1300 (D.N.J.1989) (allegations that company considered, but did not take, write-down on one of two refining facilities, but one-year later recognized a $35 million loss related to two facilities deemed sufficient to survive motion to dismiss).

The timing of a write-down, however, is not determinative. The Seventh Circuit has rejected the notion that the *timing* of an accounting write-down can serve as a basis for fraud:

> No matter when a bank [writes down a loan], someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the write-off, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*DiLeo*, 901 F.2d at 627. *See also In re First Chicago Corp.*, 789 F.Supp. 919, 922 (N.D.Ill. 1992) ("It must be more than a question of timing in order to take the matter outside the business judgment rule and into the domain of Rule 10b–5"). As one court has noted, a plaintiff cannot claim "fraud by hindsight."

> In sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.

*Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (complaint dismissed with/without prejudice pursuant to Rule 9(b)). *See also Dubowski v. Dominion Bankshares Corp.*, 763 F.Supp. 169, 172 (W.D.Va.1991) (complaint dismissed with/without prejudice pursuant to Rule 9(b)); *Ciresi v. Citicorp*, 782 F.Supp. 819, 821 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992) ("A number of these complaints have been dismissed for a reason common to

them all: the claims in essence try to penalize [the defendants] for failing to show greater clairvoyance."). *But see In re Frank B. Hall & Co., Inc.,* 693 F.Supp. 1460 (S.D.N.Y. 1988) (finding allegations of defendants' knowledge sufficient to support claim of securities fraud where timing of disclosure involving write-down was sudden because reasonable person could infer that sudden change of circumstance did not happen "overnight").

Defendants correctly note that Plaintiffs must "distinguish their situation from that of many others who are adversely affected by business reverses." *DiLeo,* 901 F.2d at 627. The stock of CHW traded at approximately $22 per share at the beginning of the Class Period and now trades at about $8. Plaintiffs want this Court to infer that "the difference [between the two prices] must be attributable to fraud." *Id.*

Timing, alone, cannot support an inference of fraud. Certainly, "a failure to disclose that a [significant asset] ha[s] suffered a permanent impairment in value" can be fraudulent, and an ultimate disclosure does not cure the failure to disclose the impairment when it is realized. However, the Court cannot infer fraud simply because CHW decided to write-down the Stony Island Facility in July of 1993, rather than December of 1992—before Plaintiffs bought their stock. Under Plaintiffs' expanded view, any write-down with its consequent negative market effect would automatically result in liability under the securities law.

The alleged "impairment" to Stony Island was evident after the 1991 explosion. Plaintiffs knew about this impairment. The only unknown factor was the effect of this impairment on CHW's financial prospects. Although the allegations raise inferences that CHW was waiting to see if the operating permit would be issued for Stony Island before taking a write-down on the Facility, planned that its bidding project for an incinerator in Kettleman Hills, California would boost its revenues and compensate for the loss of Stony Island, and hoped that the

adverse market pressures were "temporary," the allegations do not raise an inference that CHW withheld material information from the market in an attempt to "inflate" its stock price.[12] Instead, the allegations paint the picture of a company optimistically projecting that its Stony Island Facility would be operational again, and if not, that its company could compensate for the loss through other business projects. The market (and apparently Plaintiffs) shared this optimism. The timing of the write-down therefore seems to be linked with CHW's first quarter 1993 earnings, its failure to obtain an operating permit for Stony Island, and the abandonment of plans to bid on the Kettleman Hills incinerator.

Simply because hindsight shows that CHW's optimism was an error in judgment, does not mean that fraud was committed. The standard is whether the need to write-down the Facility was "so apparent" to CHW before the announcement, that a failure to take an earlier write-down amounts to fraud. *In re First Chicago Corporation Securities Litigation,* 789 F.Supp. 919, 922 (N.D.Ill. 1992). The fact that Stony Island was impaired and without an operating permit was apparent since 1991. The Company's ability to absorb the loss while waiting for a permit apparently was less certain. This certainty solidified in July of 1993 when CHW announced the anticipated write-down. Therefore, Plaintiffs allegations that the timing of the July 13, 1993, September 3, 1993, and September 30, 1993, announcements—so soon after the optimistic predictions for the first quarter of 1993—raise an inference of fraud are not sufficient, standing alone, to satisfy Rule 9(b) and survive a Rule 12(b)(6) motion to dismiss.

### B. Five Statements and CHW's Predictions

Plaintiffs allege that Defendants made the following five fraudulent statements and predictions:[13] (1) CHW promised it could "pro-

---

12. For instance, there are no allegations that defendant Rooney sold his stock in CHW before taking the write-down.

13. These statements and predictions were contained generally in six reports: (1) CHW's 1992

Annual Report to Shareholders; (2) Defendant WMX Technologies, Inc.'s 1992 Annual Report; (3) CHW's March 15, 1993 statement regarding

vide customers with needed incineration capacity," when, in fact, excess capacity already existed (¶ 40(a)); (2) CHW "optimistically projected" that "continued suspension of operations at the [Stony Island] incinerator while the permit is being pursued is not expected to materially impact future results of operations." (¶ 40(b)); (3) CHW claimed that it would "maintain its leadership in hazardous waste services and ... should expect to see revenues grow to more than $2 billion in 1993." (¶ 40(c)). In addition, CHW announced plans to "streamline its organization across the board and to focus further on controlling costs while enhancing its services to customers." (¶ 40(c)); (4) CHW advised the market that it expected to report earnings for the first quarter of 1992, but were "only able to obtain *comparable* earnings in the first quarter of 1993 by engaging in an extraordinary transaction [the sale of stock in an affiliated company] which accounted for 40% of its first quarter 1993 earnings." (¶ 40(d)); (5) CHW and WMX "attributed adverse results reported by CHW for the first quarter of 1993 primarily to such extraordinary factors as adverse weather, a weak domestic economy, and reduced activity resulting from the change in [the] Federal [A]dministration." (¶ 40(e)).

### 1. Rule 9(b)

■ Plaintiffs' allegations also do not identify the individuals who made the alleged misrepresentations and therefore do not satisfy Rule 9(b). Many of the allegations simply state that the corporate defendants, as entities rather than specific individuals representing those defendants, made the purportedly fraudulent statements, predictions and omissions. In a case involving multiple defendants, like this one, "the complaint should inform each defendant of the nature of his or her alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). *See also Mills v. Polar Molecular*

*Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *Balabanos v. North Am. Inv. Group, Ltd.*, 708 F.Supp. 1488, 1493 (N.D.Ill.1988); *Design Time Inc. v. Synthetic Diamond Technology, Inc.*, 674 F.Supp. 1564, 1569 (N.D.Ind.1987). Plaintiffs' allegations simply assert that the corporate entity spoke, misspoke or failed to speak on its own behalf. An entity speaks through its agents. Allegations that fail to identify the agents who speak for the entity do not satisfy Rule 9(b). However, even if the Court were to find that Plaintiffs' have identified defendant Rooney as the person who participated in the preparation and of the allegedly fraudulent public reports and statements, satisfying Rule 9(b), the statements and predictions identified in the Complaint fall within the SEC's safe harbor for forward looking statements.

### 2. Safe Harbor

■ Plaintiffs' allegations regarding CHW's statements and predictions during the Class Period fall within the SEC safe harbor for forward looking statements promulgated under the 1934 Exchange Act, because they do not indicate that CHW's optimistic predictions regarding the financial prospects of the Company were made in bad faith or without a reasonable basis. From hindsight, it is clear that CHW's optimistic predictions were in error. However, the SEC safe harbor protects companies from liability for erroneous estimates. "A poor performance will not automatically subject a company to suits under the securities laws." *Arazie*, 2 F.3d 1456 (7th Cir.1993) (citing *Wielgos*, 892 F.2d at 513–14).

Only the second statement outlined above was alleged as fraudulent. Defendants argue that Plaintiffs' failure to claim fraud with respect to the other four statements constitutes failure to state a 10b–5 claim. Plaintiffs, on the other hand, claim that the statements were misleading without being techni-

earnings for the first quarter of 1993; (4) CHW's Quarterly Report on Form 10–Q for the quarter ended March 31, 1993, (5) WMX's quarterly report on Form 10–Q for the quarter ended March 31, 1993; and (6) CHW's July 19, 1993 press release. (Cmplt. ¶ 40). Based on these reports, several analysts issued reports during the Class

Period, which included the following: (1) Prudential Securities report dated February 4, 1993 (Cmplt. ¶ 41); (2) Chicago Corporation report dated February 8, 1993 (Cmplt. ¶¶ 42–43); (3) Merrill Lynch report dated February 9, 1993 (Cmplt. ¶ 44); and (4) Prudential recommendation dated March 18, 1993 (Cmplt. ¶ 45).

cally false because "none of the statements set forth in ¶ 40 of the Complaint even hint at the permanent impairment in value of CHW's assets." (Pls.Opp.Mem. at 28). It was this failure, claim Plaintiffs, that rendered the four statements misleading when read as a whole.

Forward looking statements and predictions are misleading only if they are made in bad faith or without a reasonable basis in fact. *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1417–19 (7th Cir.1992). Defendants' statements were "forward looking statements" because they projected the financial impact of Stony Island's suspension of operations and other trends and events on CHW. Plaintiffs bear the burden of alleging facts suggesting that the statements were "made or reaffirmed without a reasonable basis or w[ere] disclosed other than in good faith." *Wielgos*, 892 F.2d at 513 (plaintiff bears the burden of persuasion on "reasonable basis" and "good faith" issues).

Certainly, the fact that CHW had to sell Wheelabrator Technologies, Inc., a sale which accounted for 40% of its first quarter 1993 earnings, to obtain earnings comparable to the first quarter of 1992, indicates that CHW's earnings had dropped significantly. However, this fact was available to the market at the time Plaintiffs bought CHW common stock and therefore cannot provide the basis for a fraudulent prediction which falls outside the safe harbor.

In short, there are no allegations that raise an inference that CHW intended to deceive, defraud or manipulate the market or the Plaintiffs with its optimistic predictions and statements. Rather, the Court finds that Defendants' write-down was an inevitable consequence of market pressures which existed during the Class Period. Plaintiffs were responsible for reading these signs and cannot hold Defendants liable simply because Defendants did not read the signs better, thereby permitting a public announcement of the write-down sooner rather than later.

Plaintiffs have good reason to be disappointed. Mr. Kriendler invested large sums of money relying on market and CHW predictions about the Company's short and long-term potential for growth, and lost a substantial portion of his investment when the write-down was announced and the price of CHW stock subsequently dropped. However, securities law does not permit Mr. Kriendler and the other named Plaintiffs in the potential class to impose liability on CHW based on trends and predictions which, from hindsight, can be shown to have resulted in the write-down and the charge against CHW assets, unless it can reasonably be inferred from the allegations that Defendants knew at the time the predictions were made, that these statements were false and misleading. As explained in *DiLeo*:

> The story in this complaint is familiar to securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*DiLeo*, 901 F.2d at 627–28.

## C. Adverse Trends

▬▬▬ Plaintiffs contend that CHW deceived the market by failing to publically disclose "pervasive trends" in the hazardous waste industry which suggested a future decline in the need for CHW's disposal services. (Cmplt. ¶ 3, 4, 22(B), 38, 39). CHW's Complaint does not satisfy Rule 9(b), because it does not identify "who at CHW was aware of adverse trends, what trends those individuals knew about and when such knowledge was acquired." (Def.Mem. at 22–23).

### 1. *Efficient Market Hypothesis*

General knowledge of industry trends was available to the marketplace and thus to the Plaintiffs as investors during the Class Period. Under the "efficient market hypothesis" employed by the Seventh Circuit, investors are responsible for all information available to the market. *See generally Eckstein v.*

*Balcor Film Investors,* 8 F.3d 1121 (7th Cir. 1993). The price of stock, according to this hypothesis, reflects all available information. *Id.* The alleged adverse trends developing in the hazardous waste industry during the 1990's were known to the market and thus presumably to the Plaintiffs. Allegations related to these trends therefore cannot provide the basis for a claim of fraud without additional information linking these trends to identifiable losses which Rooney (on behalf of CHW) knowingly and intentionally withheld from the market. Furthermore, even if CHW contemplated the impact of these trends on its financial prospects, "[s]ophisticated investors are expected to 'understand the limits of a projection' " and trends which are public knowledge must be assessed by an investor relying on this projection. *Arazie,* 2 F.3d at 1468 (quoting *Wielgos,* 892 F.2d at 514). Although CHW had a duty under SK–303 to disclose trends affecting its business, disclosure implies that the trends are hidden (i.e., not already known to the public) or at least the trends' impact on the company is not known. Plaintiffs' have not demonstrated that the alleged trends and their impact on CHW was not already public knowledge. Further, even if Plaintiffs have alleged that CHW breached a duty under SK–303, breach of that duty is not actionable by the Plaintiffs for the reasons stated below.

### 2. *SK–303*

SEC Regulation SK–303, 17 C.F.R. § 229.303(a)(3)(ii), requires companies to report certain events, uncertainties and trends. Plaintiffs claim that CHW's purported failure to inform the public of certain adverse trends that were unfolding in the hazardous waste disposal market was a breach of its duty under the Exchange Rule and therefore shows a violation of § 10b and Rule 10b–5. The Ninth Circuit found in *In re VeriFone Securities Litigation,* 11 F.3d 865 (9th Cir. 1993), that while SK–303 requires disclosure of known trends and uncertainties, another SEC regulation states that forward-looking information need not be disclosed. 17 C.F.R. § 229.303(a). In addition, the *VeriFone* Court found that "violation of an exchange rule will not support a private claim." *Id.* at 870. The Court then held that a shareholders claim that a violation of SK–303 violates § 10(b) or Rule 10b–5 "amounts to the same thing." Therefore, the Court "decline[d] to hold that a violation of, exchange rules governing disclosure may be imported as a surrogate for ... analysis under § 10(b) and Rule 10b–5." *Id.*

The Seventh Circuit has not ruled on this issue, but we find the Ninth Circuit's analysis persuasive and therefore adopt it as the rule in this case. Plaintiffs' Complaint must therefore be dismissed on this ground as well.

## II. The Motion For Class Certification

Plaintiffs have filed a Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.[14] Rule 23 states in relevant part:

**Rule 23. Class Actions**

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and

---

**14.** Although the Court is dismissing the case, class certification will ensure that piecemeal litigation does not ensue regarding the issues already decided by this Court.

nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Plaintiffs claim that the requirements of Rule 23(a) and (b)(3) are clearly met and the Court should grant class action status. Defendants claim that Plaintiffs have not satisfied elements (3) or (4) of Rule 23(a). Since Defendants apparently concede that Plaintiffs can satisfy Rule 23(a)(1) and (2) and 23(b)(3), by contesting only elements (3) and (4) of Rule 23(a), the Court will address only these claims.

Plaintiffs propose that the class be defined as "all persons who purchased the common stock of CHW between February 4, 1993 and September 3, 1993, inclusive. Excluded from the proposed Class are defendants, their affiliates, and members of the immediate family of the individual defendant." The Court grants Plaintiffs' Motion, and the Class will be defined as proposed with one exception: the Class Period will terminate on July 19, 1993, rather than September 3, 1993, for the reasons expressed at the conclusion of this Opinion.

### A. Typicality

■ A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Defendants advance two arguments in support of their position that Kriendler is an "atypical" plaintiff: (1) Because he sold his stock on June 22, 1993,[15] before the write-down occurred, Kriendler could not have been damaged by the alleged, artificial inflation of the price of CHW stock (Def.Mem. at 12); (2) Defendants believe that because Kriendler is "an 'in-an-out' plaintiff he can be contrasted with ... 'reten-

tion' plaintiffs who held their stock through the end of the Class Period, and, in some instance, still own that stock." (Def.Opp.Mem. at 16). Defendants claim that retention plaintiffs still have an interest in CHW stock which Kriendler, and the other "in-and-out" plaintiffs, does not share.

These arguments are not relevant to a typicality claim because typicality focuses on whether each class member's claims arise from the same event or practice. *Rosario v. Livaditis,* 963 F.2d 1013 (7th Cir.1992). Plaintiffs' claims all relate to the theory that CHW should have taken a write-down of the Stony Island Facility before December 31, 1992, and committed fraud under § 10b–5 by issuing allegedly misleading and fraudulent statements regarding its financial condition prior to the July 19, 1993, announcement. Plaintiff Kriendler can represent the class with respect to these claims even though he sold his stock before the actual write-down occurred. By definition, the alleged fraud occurred before the July 19, 1993, announcement. Furthermore, the alleged "damage" resulting from this fraud was of an "ongoing" nature, since the price of the stock dropped from $21 per share on February 4, 1993 to $8½ per share on July 19, 1993, and continued to trade at about this price throughout the rest of the Class Period. Thus, Plaintiffs buying or selling at any time during the Class Period would have been affected by any fraud which could be linked with "inflated" prices at the time of purchase. Therefore, Plaintiff Kriendler's claims are typical of those shared by the class of plaintiffs who retained stock after the July 19, 1993, announcement.

### B. Adequacy of Representation

Defendants claim that Plaintiffs Kriendler and Seposs are not adequate class representatives. Defendants argue that Plaintiff Kriendler is not an adequate representative because he is 88 years old, has heart problems, and does not understand the basic facts

---

**15.** Plaintiff Kriendler bought his 2,000 shares of CHW stock on March 8, 1993 and sold those

shares on June 22, 1993. (Def.Opp.Mem. at 12).

underlying his claims.[16] (Def.Opp.Mem. at 17–18). Plaintiff Seposs is allegedly an inadequate class representative because he does not have "any real stake in the lawsuit's outcome." (Def.Opp.Mem. at 22). By his own admission, Mr. Seposs' damages cannot exceed $4.82 and are probably even less than $2.

▮ There are three general requirements to satisfy the adequacy element of Rule 23(a): (1) The chosen class representative cannot have antagonistic or conflicting claims with other members of the class. *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992); (2) the named representative must have a "sufficient interest in the outcome to ensure vigorous advocacy." *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D.Ill. 1986); and (3) counsel for the named plaintiff must be competent, qualified, experienced, and able to vigorously conduct the proposed litigation. *Id.* The dispute centers on whether Mr. Kriendler can ensure vigorous advocacy, and whether Mr. Seposs has a sufficient monetary interest in the lawsuit. Defendants also argue that class counsel is inadequate.

▮ With respect to Mr. Kriendler, Defendants point to deposition excerpts which indicate that Mr. Kriendler did not know how many defendants he had sued, who he had sued, and could not describe either the kind of business CHW is engaged in or the basis for the lawsuit. Defendants then cite *Darvin v. Int'l Harvester Co.*, 610 F.Supp. 255, 257 (S.D.N.Y.1985) and *Kassover v. Computer Depot, Inc.*, 691 F.Supp. 1205, 1213–14 (D.Minn.1987), *aff'd*, 902 F.2d 1571 (8th Cir. 1990), for the proposition that a class representative must understand the basic facts underlying his claims. Plaintiffs claim that Mr. Kriendler understands the basis for this lawsuit as obtaining a remedy against CHW for its allegedly fraudulent statements.

Although Defendants point to several examples of Mr. Kriendler's apparent misunderstanding of basic facts underlying this litigation, in this Circuit, courts have been unwilling to deny class certification on adequacy grounds where the challenge is based on the representative's memory. *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 186 (N.D.Ill.1992); *In re VMS Securities Litigation*, 136 F.R.D. 466, 478 (N.D.Ill. 1991). *Kaplan v. Pomerantz*, 131 F.R.D. 118, 121–122 (N.D.Ill.1990). General knowledge and a participation in discovery are enough. *Schwartz v. System Software Associates, Inc.*, 138 F.R.D. 105, 107–08 (N.D.Ill. 1991); *Harman v. LyphoMed*, 122 F.R.D. 522, 528 (N.D.Ill.1988); *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 790 (N.D.Ill.1984). Furthermore, other courts have rejected challenges to class certification based on age and health. *Garfinkel v. Memory Metals*, 695 F.Supp. 1397, 1405 (D.Conn. 1988); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 80 (E.D.Pa.1987); *Fickinger v. C.I. Planning Corporation*, 103 F.R.D. 529, 533 (E.D.Pa.1984); *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D.Fla.1992).

Given this case law, the issue appears to be whether Mr. Kriendler has even "general knowledge" of the basic facts underlying this lawsuit, not whether he is an 88 year old man with heart problems. The deposition statements regarding Mr. Kriendler's memory of certain facts and his statements indicating his unwillingness to make a financial contribution to this lawsuit, while relevant, do not persuade us that Mr. Kriendler lacks a basic understanding of the basis for this lawsuit or the interest and capability to represent the class.[17] Rather, Mr. Kriendler's uncertainty or ignorance of certain facts appears to be due to his reliance on counsel to know those facts for him.

The issue of whether class counsel is adequate can be disposed of quickly. Rule

---

**16.** Defendants also make a passing reference to Mr. Kriendler's unwillingness to devote personal funds to the lawsuit or pay the costs of suit if the case is unsuccessful. In *Rand v. Monsanto Co.*, 926 F.2d 596 (7th Cir.1991), the Seventh Circuit indicated that a plaintiff's unwillingness to pay anything may be used as a clue to his lack of interest in the litigation; however, a plaintiff's unwillingness to pay everything cannot serve as a

*per se* rule of inadequacy. "[N]o person need be willing to stake his entire fortune for the benefit of strangers." *Id.* at 598–99.

**17.** Given this finding, the Court need not reach the issue of whether Mr. Seposs is an adequate representative for the class.

23(a)(4) merely requires the class lawyers to be "qualified, experienced, and generally able to conduct the proposed litigation." *Susman v. Lincoln American Corp.,* 561 F.2d 86, 90 (7th Cir.1977). Defendants, however, contend that class counsel is inadequate, because 3 of the 11 attorneys representing the plaintiffs in this case have failed to file Rule 39 affidavits, and all attorneys involved in this case have failed to prepare and submit a required "written contingent fee agreement." Although these failures may be violations of Local General Rule 39, this fact is not relevant to the issue of adequacy as it relates to counsels' competence to litigate this case.

### C. The Class Period

 Finally, Defendants correctly assert that the proposed Class Period should be revised. It is well-established that "an investor cannot close his eyes to a known risk." *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522 (7th Cir.1985). Whenever an investor "already possesses information sufficient to call the representation into question, he cannot later claim he relied on or was deceived by the lie." *Id.* If an investor knows enough so that he is "cognizant of the risk, then there is no liability." *Id.*

On July 19, CHW told the market of the risk associated with the uncertainty of the carrying value of its incinerator assets. The market was informed that there was a possibility or risk that CHW would write-down its assets within the next 75 days. Any investor purchasing CHW stock after July 19, 1993, bought at their own risk and cannot claim damages based on fraud allegedly occurring through statements and predictions asserting the opposite result prior to that date.

A similar situation occurred in *In re LTV Securities Litigation,* 88 F.R.D. 134, 147–48 (N.D.Tx.1980), where the corporate defendant announced that an anticipated adjustment to asset values "would have a materially adverse impact on the [company's] reported results of operation...." *Id.* As a consequence of this disclosure, the court ruled that "post-announcement purchasers would

be hard put to travel upon a fraud-on-the-market theory." *Id.* The court then concluded that it was required to cut off the class period on the date of the announcement. This Court has reached the same conclusion and therefore will terminate the Class Period as of July 19, 1993.

### CONCLUSION

Defendants' Motion to Dismiss is granted (# 40–1), and the Clerk of the Court is directed to dismiss this case with prejudice. Plaintiffs' Motion for Class Certification is also granted (# 46–1), and the Clerk is directed to certify the class as "all persons who purchased the common stock of CHW between February 4, 1993 and July 19, 1993, inclusive. Excluded from the proposed Class are defendants, their affiliates, and members of the immediate family of the individual defendant." [18] In addition, the Court adopts the Magistrate Judge's Recommendation that (1) the Report and Recommendation entered April 21, 1994, granting defendants' March 16, 1994 motion for sanctions be vacated and (2) defendants' Motion for Sanctions be denied (doc. # 149). This case is terminated. Each party is to bear their own costs.

---

**18.** Plaintiffs' Motion to voluntarily dismiss, without prejudice, the Tennison and Zuckerman Complaints (doc. # 20–1) and to add Tennison and Zuckerman as named plaintiffs on the Kriendler Complaint (doc. # 20–2) is mooted by this ruling.