**Albert ORAN, individually and on behalf of a class of others similarly situated; Terry Adolphs, Philip Morris, James Doyle Lupo; and Paul H. Maurer**

v.

**John R. STAFFORD; Robert G. Blount; Joseph J. Carr; Louis L. Hoynes, Jr.; William J. Murray; David M. Olivier; John R. Considine; Paul J. Jones; Fred Hassan; and American Home Products Corporation.**

Civil Action No. 97–4513(NHP).

United States District Court,
D. New Jersey.

Feb. 5, 1999.

Allyn Zissel Lite, Joseph J. De Palma, Goldstein, Lite & De Palma, LLC, Newark, Marian P. Rosner, Wallace A. Showman, Michael A. Schwartz, Wolf Popper LLP, New York City, for Plaintiffs.

Donald A. Robinson, Robinson, Lapidus & Livelli, Newark, NJ, Anthony F. Phillips, Elizabeth S. Stong, James H. Bicks, Peter M. Brown, Willkie Farr & Gallagher, New York City, for Defendants.

### *LETTER OPINION*

### *ORIGINAL ON FILE WITH CLERK OF THE COURT*

POLITAN, District Judge.

Dear Counsel:

This matter comes before the Court on defendants' motion to dismiss the Amended Class Action Complaint. The Court heard oral argument on October 29, 1998. For the reasons explained below, defendants' motion is GRANTED and the Amended Class Action Complaint is DISMISSED WITH PREJUDICE as to the federal causes of action. The pendent state-law claims are DISMISSED WITHOUT PREJUDICE.

### *FACTUAL BACKGROUND*

This class action is predicated upon defendants' allegedly false and misleading statements concerning the weight-loss drugs Pondimin and Redux (hereinafter collectively referred to as "Redux").

Defendant American Home Products Corporation ("AHP") is organized under the laws of the State of Delaware and maintains its principal corporate offices in Madison, New Jersey. AHP engages in the research, development, manufacture, and marketing of prescription and over-the-counter medications. At all times relevant to this litigation, AHP promoted, marketed, and sold the anti-obesity drug Redux, which was approved by the Food and Drug Administration during the Spring of 1996. The Complaint alleges, among other things, that AHP violated the Securities Exchange Act of 1934 during the period beginning March 1, 1997 and ending September 16, 1997.

The class plaintiffs allege that the defendants, while in possession of information suggesting that Redux is linked to serious heart-valve damage, misled the investing public to believe that the drug was safe and that it would continue to generate substantial revenues for defendant AHP. Plaintiffs further allege that the omissions and misstatements were made with fraudulent intent, that defendants' conduct artificially inflated the market price of AHP stock, and that this fraud on the market caused plaintiffs to suffer damages.

Plaintiffs allege that AHP first became aware, or should have become aware, that Redux caused heart-valve abnormalities in July of 1994. Three years later, on July 8, 1997, the Food and Drug Administration ("FDA") and AHP publicly disclosed that there had been reports of heart-valve problems in patients taking Redux. On September 15, 1997, AHP announced that it would voluntarily withdraw Redux from the market.

Defendants move to dismiss the Amended Class Action Complaint because it fails to state a claim upon which relief can be grant-

ed or, in the alternative, because it fails to plead the elements of fraud with sufficient particularity.

## DISCUSSION

Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The private right of action created by Section 10(b) and Rule 10b–5 imposes liability for false or misleading statements or omissions of material fact that affect trading on the secondary market. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

A claim under Rule 10b–5 has three essential elements. First, a plaintiff must establish that the defendant made a materially false or misleading statement, or that the defendant omitted to state a fact such that other statements of fact actually made were rendered materially misleading. *See In re Phillips Petroleum Securities Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989). Second, a plaintiff must establish that the defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused an injury to plaintiff.[1] *See id.* at 1244. Third, a Rule 10b–5 plaintiff must satisfy the heightened pleading requirements set out in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1417–20 (3d Cir.1997); 15 U.S.C. § 78u–4(b)(2).

## I. Rule 9(b) & PLSRA: Allegations of Scienter

Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This requirement has been "rigorously applied in securities fraud cases." *In re Bur-*

*lington Coat Factory*, 114 F.3d 1410, 1417 (3d Cir.1997). Moreover, and more specifically, the Private Securities Litigation Reform Act of 1995 requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—in this case, fraudulent intent. 15 U.S.C. § 78u–4(b)(2).

The Third Circuit has held that the requisite "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat*, 114 F.3d at 1418 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995)).

## A. The Corporate Defendant: American Home Products

Turning first to AHP's motive to commit fraud, plaintiffs allege that the company repeatedly touted Redux as a breakthrough weight-loss drug that would generate significantly increased corporate profits. Specifically, the Amended Class Action Complaint alleges that, in a July 23, 1996 press release, AHP announced that the company's "U.S. pharmaceutical sales increased 14 percent in the 1996 second quarter and 7 percent for the first half [and that these sales gains] were primarily due to introductory sales of Redux...." ¶ 72. The Complaint also references an August 13, 1996 article in Investor's Business Daily which stated that "[n]ew products should continue to boost the company's earnings. Redux, a weight-loss drug, became available in June." ¶ 73 The article was titled "American Home Products Grows By Launching New Drugs." *Id.* In addition, plaintiffs allege that AHP sales representatives made more than 285,000 visits to physicians to promote Redux between May and December of 1996. *See id.* ¶ 68. These allegations, if proven, are sufficient to establish

---

1. The "fraud on the market" theory accords plaintiffs in Rule 10b–5 class actions a rebuttable presumption of reliance if plaintiffs bought or sold their securities in an "efficient" market. It is undisputed in this case that AHP stock was traded in an efficient market at all relevant times. Therefore, plaintiffs need not show that they actually knew of the communications that contained the allegedly misleading statements or omissions. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1419 n. 8 (3d Cir.1997).

that AHP had a motive to fraudulently mislead the investing public about Redux's safety.

With regard to AHP's opportunity to commit fraud concerning Redux's link to heart problems, plaintiffs allege that, in February of 1994, a French pharmaceutical company informed AHP that Belgian doctors had reported at least thirty cases of heart-valve problems in patients taking Redux. *See* Amended Class Action Complaint ¶ 51. The Complaint also alleges that in March of 1997, representatives from the Mayo Clinic in Rochester, Minnesota provided AHP with detailed information concerning five patients taking fen-phen[2] who were at the time experiencing similar heart-valve abnormalities. *See id.* ¶ 83. These allegations, if proven, are sufficient to establish AHP's opportunity to mislead the investing public. The allegations are also corroborative of AHP's motive.

## B. The Individual Defendants

■ With regard to the individual defendants, the Complaint alleges that several AHP executives intentionally concealed material information in order to artificially inflate the value of AHP's stock, and that they profited by selling portions of their shares at the inflated price. In support of this theory of liability, the Complaint gives the names of the insiders who sold stock, the quantities of stock sold and the prices at which the sales occurred, the dates of the sales, and each defendant's estimated profit. *See* Amended Class Action Complaint ¶ 167. The Complaint also alleges that these sales occurred shortly before the Mayo Clinic's announcement regarding Redux's connection to heart-valve problems. *See id.* ¶ 168.

However, the Third Circuit has held that plaintiffs in 10b actions "must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary 'strong inference of scienter.'" *See Burlington Coat,* 114 F.3d at 1424 (dismissing class action complaint for, among

other things, failure to plead scienter with particularity). The allegations in the Amended Class Action Complaint are inadequate to support such an inference in this case.

First, two of the officer defendants, including AHP's president and CEO, are not alleged to have traded at all. *See id.* As to the remaining individuals, plaintiffs provide no information as to whether the trades were normal and routine for each executive. *See Burlington Coat,* 114 F.3d at 1423. Nor is there information "as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud." *Id.* The Complaint does "not even have information as to their total [AHP] stock holdings, [and so there is] even less of a basis to infer that the sales were unusual or suspicious." *Id.*

Where "plaintiffs choose to allege fraudulent behavior based on what they perceive as 'suspicious' trading, they have to allege facts that support that suspicion." *Burlington Coat,* 114 F.3d at 1424. In this case, the allegations of scienter fall far short of the rigorous pleading requirements established in *Burlington Coat* and the Amended Class Action Complaint must therefore be dismissed as to the individual defendants.

For the reasons explained above, the claims asserted against the individual defendants lack the specific allegations required by Rule 9(b) and the Private Securities Litigation Reform Act of 1995.[3] However, the allegations as to American Home Products are sufficiently particular to comply with the heightened pleading requirements.

## II. Rule 12(b)(6) & Materiality

### A. AHP's Failure to Disclose Prior to July 8, 1997

■ Plaintiffs allege that AHP misled the investing public by withholding information it

---

**2.** Pondimin, AHP's precursor to Redux, was one of two drugs that comprised the fen-phen drug cocktail.

**3.** In light of this Court's ruling that the Complaint fails to state a claim upon which relief may be granted, the issue of particularity is moot; repleading the allegations would serve no purpose.

possessed concerning medical problems associated with the use of Redux. Specifically, plaintiffs allege that AHP failed to adequately inform investors and potential investors about recent reports of heart-valve abnormalities occurring in women taking Redux. Plaintiffs claim that this information would have been helpful to investors—and thus "material" within the meaning of Rule 10b–5—because it might have signaled the beginning of a period of diminished company revenues and increased products liability exposure.

Undisclosed information is material if "there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *In re Westinghouse Securities Litigation*, 90 F.3d 696, 714 (3d Cir.1996)(internal citations omitted). However, in the context of an efficient market, "the concept of materiality translates into information that alters the price of the firm's stock." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1425 (3d Cir.1997). If a company's disclosure of information has no effect on the company's stock price, "it follows that the information disclosed ... was immaterial as a matter of law." *Id.* (explaining that, in an efficient market, "information important to reasonable investors ... is immediately incorporated into the stock price"). If the information was immaterial, then its nondisclosure is not actionable.

In this case, plaintiffs allege that AHP knew about potential heart-valve problems associated with Redux long before the company publicly disclosed this information on July 8, 1997. However, there is no allegation that this information, once publicized on July 9, had any appreciable effect on AHP's stock price.[4] Indeed, the share price rose by $3.00 during the four days following the July 8 announcement. The share price did not begin to falter until AHP announced on September 15, 1997 that it was withdrawing Redux from the market.[5] The Third Circuit's decision in *Burlington Coat* therefore

compels this Court to conclude that the medical data disclosed by AHP on July 8, 1997 was immaterial as a matter of law.

 Notwithstanding the behavior of AHP's stock price following the July 8 announcements, plaintiffs seem to contend that the investing public was materially misled when AHP failed to disclose the specific medical data that formed the basis of its July 8 press release. That data consisted of the following three types of information: (1) European reports of heart-valve damage in 25 patients taking Redux; (2) adverse-reaction reports from patients taking Redux; and (3) information provided by the Mayo Clinic and MeritCare Health System in March 1997 describing 17 female fen-phen users who had developed heart-valve problems. Plaintiffs also claim that "[d]efendants had been aware of the first two components before and during consideration and recommendation of Redux by the FDA Advisory Committee in late 1995 and at the time of the FDA's approval in spring 1996, but they never gave that information to the Advisory Committee." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint at 3.

 There is no allegation that AHP had any legal obligation to report these findings to the FDA. Therefore, plaintiffs appear to contend that a pharmaceutical company owes a greater duty to disclose adverse medical data to the investing public than it owes to the FDA during a drug's approval process. This Court is not prepared to take that rather extraordinary leap, particularly in a case where the basic information—a reported association between the use of fen-phen and heart valvular disease—had no effect on the company's stock price once it was disclosed on July 8, 1997. More importantly, the plaintiffs do not allege that these details, if disclosed, would have materially altered the substance of the July 8 press releases. In this Court's view, the omitted data would

---

**4.** It is undisputed that AHP stock was traded in an efficient market at all times relevant to this litigation.

**5.** Plaintiffs do not allege that AHP had a duty to disclose its intention to withdraw Redux prior to September 15.

have added nothing more than a bibliography.[6]

### B. Misrepresentations After the July 8, 1997 Disclosure

■ Plaintiffs claim that AHP continued to mislead the investing public even after it disclosed the existence of medical reports suggesting a correlation between heart-valve abnormalities and Redux. Specifically, plaintiffs allege that

> defendants continued their scheme [after July 8, 1997] by failing to [disclose] publicly the existence of the European findings and adverse-reaction reports, and further, failing to disclose that they had been in possession of the Mayo, MeritCare and European findings since at least March 1997. In addition, defendants issued false and misleading statements contradicting and whitewashing the seriousness of the disclosed findings.

Plaintiff's Memorandum in Opposition at 22.

Turning first the allegation of "contradicting and whitewashing," plaintiffs insist that AHP materially misled the investing public when it repeatedly characterized the medical data as "limited and therefore inconclusive," and also when AHP claimed that "additional scientific investigation must be conducted before any possible link can be confirmed." Amended Class Action Complaint ¶ 105. For two reasons, this Court finds that, as a matter of law, the statements recited in the Complaint were not materially misleading.

First, AHP's statement that the medical data was preliminary, inconclusive, and in need of further study, is too vague to be actionable. *See Burlington Coat,* 114 F.3d at 1425 (noting that "soft, puffing statements" generally lack materiality because the market price of a share is not affected by vague

statements). In other words, while AHP's July 8 disclosure of the existence of the medical data was factual in nature, the company's *characterization* of that data as "inconclusive" was merely an attempt to "spin" the facts in an unalarming light. This is simply not the type of statement upon which a reasonable investor would rely.

Second, even assuming that a reasonable investor might view AHP's statements as specific, factual assertions, those statements were not even arguably misleading. A cursory review of the contemporaneous press releases issued by the FDA and the Mayo Clinic reveals that AHP's characterization was completely accurate: The FDA's July 8, 1997 announcement, addressed to "Dear Health Professional," stated:

> *Presently there is no conclusive evidence establishing a causal relationship* between these two products and valvular heart disease. However, given the seriousness of the reported valvular disease and its rare occurrence in otherwise healthy obese women in this age range, we believe that patients and health care professionals should be notified of this information.

Amended Class Action Complaint ¶ 103 (emphasis added).

Similarly, the Mayo Clinic's July 8, 1997 announcement stated:

> We believe these cases raise significant concern that this combination of appetite suppressants has important implications regarding valvular heart disease. *But more comprehensive study is needed to confirm the associations.*

*Id.* at ¶ 100 (emphasis added). Defendant's July 8, 1997 announcement stated:

> [AHP] has reviewed the case reports from the Mayo Clinic and is concerned about the potential association of vascular

---

6. Plaintiffs also contend that AHP's failure to disclose the foregoing information in the Company's 1996 Form 10–K, Annual Report, and Form 10–Qs constituted a breach of its duty to include "a discussion of any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." SEC Regulation S–K, Item 303(a).

The Third Circuit has recently expressed doubt about whether violations of Item 303 create an independent cause of action. *See Burlington Coat,* 114 F.3d at 1419 n. 7. But even assuming such violations do give rise to a private cause of action, adverse medical reports concerning one drug manufactured by a pharmaceutical company is not a "trend or uncertainty" within the meaning of the statute. *See In re Canandaigua Securities Litig.,* 944 F.Supp. 1202, 1209–10 (S.D.N.Y.1996).

disorders with the combination use of two separate medications, phentermine and fenfluramine, sometimes referred to as "phen/fen." Because the data from the Mayo Clinic are limited and therefore inconclusive, additional scientific investigation must be conducted before any possible link can be confirmed. Obesity is associated with serious health disorders. Patients taking "phen/fen" should not be alarmed, but are advised to consult their doctors if they have any concerns.

> [AHP] is working with Mayo Clinic to develop a rigorous, prospective study which will provide clinical data to properly examine this issue.... [AHP] is committed [to] working closely with the Clinic in conducting further research.

*Id.* at ¶ 105. This statement was not false when it was made; nor was it rendered false by any subsequent statement or event. Indeed, plaintiffs' claim of "contradicting and whitewashing" is rather perplexing because plaintiffs do not allege that there existed any conclusive finding that Redux causes heart disease; they do not even allege that there had been any systematic study of the question. It is therefore clear, from the face of the Complaint, that AHP's assertion that the existing medical data was "inconclusive [and in need of] additional scientific investigation" was not misleading; by all accounts it was true.

With regard to AHP's failure to reveal the additional European findings and adverse-reaction reports,[7] and also with regard to the length of time AHP knew about them, plaintiffs do not allege or suggest how this information would have added anything to the disclosures already made on July 8, 1997. That is, the Complaint does not suggest how this information would have "significantly altered the total mix of information" in a way that would be relevant to a reasonable investor. *In re Westinghouse Securities Litig.,* 90 F.3d 696, 714 (3d Cir.1996).

#### C. Misrepresentations Regarding the FDA Approval Process

■ Finally, plaintiffs allege that AHP misled the investing public about the FDA approval process by stating, for example, that "the FDA cleared Redux ... following a thorough review of more than 17 clinical trials which indicated that [it] is an effective appetite suppressant with an acceptable safety profile." Amended Class Action Complaint ¶ 115. Plaintiffs contend that this statement, and others like it, was materially misleading because it incorrectly suggested that AHP had disclosed to the FDA all available information relating to Redux's safety.

However, the statements about which plaintiffs complain do not even remotely suggest that the FDA's approval was based upon a review of every existing piece of relevant medical data. At best, the statements recited in the Complaint imply only that the FDA conducted a systematic and thorough review and concluded that Redux was safe and effective when used as a weight-loss drug. Moreover, plaintiffs do not allege that AHP breached any of its FDA reporting obligations; nor do plaintiffs allege that any of this undisclosed information would have changed the outcome of the FDA approval process. Perhaps more importantly, plaintiffs do not allege why a reasonable investor, in deciding whether to buy or sell shares of AHP stock, would consider these details of the FDA approval process relevant.

### III. Leave to Amend

■ Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires." However, leave may be denied upon a showing of, among other things, unduly delay or futility. *See Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993). In this case, the Court is persuaded that leave should be denied for both of these reasons.

Turning first to the issue of delay, "the Complaint in this case [is] plaintiffs' second. Further, plaintiffs not only had approximately four months between the initially filed complaint and the [amended] complaint that

---

7. Plaintiffs' claim regarding the adverse-reaction reports is somewhat unclear in light of their admission that the FDA Advisory Committee was aware of "most" of them. *See* Amended Class Action Complaint ¶ 53–54.

is at issue here, but the Complaint appears to ... represent the efforts of [two] different law firms." *Burlington Coat*, 114 F.3d at 1435 (suggesting that these factors alone might warrant a finding of undue delay). In addition, plaintiffs' counsel insisted at oral argument that "we would not like to replead because we're concerned [it] would just delay this case even more." Transcript of Proceedings, Oct. 29, 1998, at 34–35.

This case is already one and a half years old; no discovery has been taken; and plaintiffs had four months to file the instant Amended Class Action Complaint. This Court believes that granting leave to file yet another amended complaint would cause undue delay.

This Court is also convinced that granting leave to amend would be futile. Futility is governed by the same standard of legal sufficiency that applies under Rule 12(b)(6). *See Burlington Coat*, 114 F.3d at 1435.

The core facts in this litigation are not really in dispute. On July 8, 1997, the FDA, Mayo Clinic, MeritCare Health Systems, and defendant AHP issued separate press releases notifying the public of reported occurrences of heart-valve abnormalities in women taking Redux; all of the July 8 press releases described the reports as serious, but inconclusive and in need of further study; AHP's stock price was not adversely affected by these announcements (the share price actually rose by three dollars during the four days following the press releases). *See* Complaint at ¶¶ 100–05.

In what can only be described as an artful attempt to plead the allegations around the behavior of AHP's stock price, plaintiffs

claim that AHP's stock price began to drop on September 15, 1997, when the market learned of previously undisclosed adverse-reaction reports and approximately thirty additional reports of heart valve damage occurring in European women.[8]

As this Court has already explained, the allegedly omitted information consists primarily of the reports of heart valve damage to which the July 8 press releases referred.[9] As a matter of law, these facts would not have "altered the basic mix of information" that had already been disclosed on July 8, 1997. *See In re Westinghouse Securities Litig.*, 90 F.3d 696, 714 (3d Cir.1996). This might be a different case if plaintiffs alleged that AHP concealed information that was not reasonably implied by the July 8 press releases, *e.g.*, medical studies finding a causal connection between Redux and heart valvular disease, but plaintiffs conspicuously omit any such allegation.

These are the central facts of this case and they are essentially undisputed. The only real question is whether the information omitted by AHP could have materially altered the basic message conveyed by the July 8, 1997 press releases. This Court has concluded that the omitted information was immaterial as a matter of law.

At oral argument, plaintiffs' counsel recognized that "repleading is not going to answer the questions" raised by this 12(b)(6) motion, and this Court agrees.[10] Trans., Oct. 29, 1998 at 35. Granting leave to file a second amended complaint would be futile in this case.

8. The Court is not here asked to identify the actual cause of AHP's stock performance. Nevertheless, the Court would be remiss if it failed to point out that the decline in the share price began immediately after AHP announced on September 15, 1997, that it was withdrawing Redux from the market. Plaintiffs apparently believe—indeed it is the gravamen of their Complaint—that the connection between the withdrawal of Redux and the dip in AHP's stock price was merely coincidental. Although the Court does not pass upon the question, it notes that plaintiffs' carefully pleaded allegations find no support in common sense.

9. Of course, plaintiffs also allege that AHP materially misled the public by failing to disclose various details concerning the FDA approval process, by failing to disclose the length of time AHP had known about the heart valve problems; and by "minimizing and whitewashing" the findings. However, this Court has determined that these omissions were not materially misleading.

10. Plaintiffs suggested that the only additional allegations that they might include in a second amended complaint would consist of additional reports of heart valve disease in women taking Redux.

### CONCLUSION

In sum, this Court concludes that AHP did not materially mislead the investing public by failing to come forward with the reports of valvular heart disease prior to July 8, 1997; nor did AHP mislead the public by failing to disclose the specific medical data that formed the basis of its July 8 announcement; nor did the July 8 disclosure become materially misleading as a result of AHP's failure to make any additional or subsequent disclosures. At bottom, the Amended Class Action Complaint simply fails to pass the muster of *Burlington Coat,* 114 F.3d 1410 (3d Cir.1997). Accordingly, Counts I and II must be dismissed.

The Court will not exercise supplemental jurisdiction over the pendent state-law claims.

An appropriate Order accompanies this Letter Opinion.

### FINAL ORDER

THIS MATTER having come before the Court on defendants' motion to dismiss the Amended Class Action Complaint; and the Court having heard oral argument on October 29, 1998; and the Court having also considered the parties' written submissions; and for good cause shown;

IT IS on this 5th day of February, 1999

ORDERED that defendants' motion is **GRANTED;** and it is further

ORDERED that the Amended Class Action Complaint be and hereby is **DISMISSED WITH PREJUDICE** as to the federal claims (Counts I and II); and it is further

ORDERED that the Amended Class Action Complaint be and hereby is **DISMISSED WITHOUT PREJUDICE** as to the state-law claims (Counts III and IV); and it is further

ORDERED that this case is **CLOSED.**